UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

SEARS AUTHORIZED HOMETOWN STORES, LLC,      )
                                            )
                        *Plaintiff*,        )
                                            )
                        v.                  )      No. 4:21-cv-00091-JMS-KMB
                                            )
LYNN RETAIL, INC., JERRY SCHNEIDER, and     )
LAURA SCHNEIDER,                            )
                                            )
                        *Defendants*.       )

## ORDER

Plaintiff Sears Authorized Hometown Stores, LLC ("Sears") brings this action against Defendants Lynn Retail, Inc. ("LRI"), Jerry Schneider, and Laura Schneider (collectively, "the Schneiders"), alleging unfair competition under the Lanham Act, 15 U.S.C. § 1125, as well as tortious interference with a contract and tortious interference with prospective economic advantage under Indiana law. [Filing No. 1.] The Schneiders have filed a Motion for Summary Judgment, [Filing No. 54], which is ripe for the Court's decision.

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the

summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if

those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS[1]

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Sears' Business Model

Sears is a national retailer of home appliances and licenses Sears Hometown Stores to individual dealers in smaller communities throughout the country. [Filing No. 56-1 at 3.] Sears enters into a written operating agreement with each dealer, under which Sears owns the merchandise stocked in all Sears Hometown Stores and the dealers offer it for sale to the public on consignment, using Sears branding and marketing materials. [Filing No. 56-1 at 3.] Sears owns two registered trademarks—"Sears Hometown Store" and "Sears Authorized Hometown Store"—which it authorizes dealers to use while operating Sears Hometown Stores, including in advertising and marketing materials. [Filing No. 56-1 at 3; Filing No. 56-3 at 8-9.] Pursuant to

---

[1] The parties failed to follow the undersigned's Practices and Procedures for filing and citing exhibits. [*See* Filing No. 6 at 2-3 (explaining that electronically filed exhibits should be filed before supporting briefs and that citations to such exhibits should be to the docket number of previously-filed exhibits).] This failure has made the Court's review of the Motion for Summary Judgment unnecessarily cumbersome. Sears also failed to follow the directive in the Practices and Procedures requiring the submission of deposition excerpts, and failed to include the three pages immediately preceding and following each cited excerpt. [*See* Filing No. 6 at 2.] The parties and their counsel are advised that the Practices and Procedures are not optional and must be followed in this and other cases going forward.

the operating agreement, dealers promise to cease use of Sears' intellectual property upon termination of the agreement.  [Filing No. 56-3 at 8.]  Additionally, the operating agreement prohibits a dealer—and his or her affiliates and immediate family—from having any ownership interest in any competing business located within 50 miles of any Sears Hometown Store during the term of the operating agreement or for a period of two years after termination of the operating agreement.  [Filing No. 56-3 at 16.]

### B.  Scott Schneider's Operation of the Corydon Sears Store

In June 2016, Sears dealer Scott Schneider ("Scott"),[2] acting through his entity SJS Retail, Inc. ("SJS Retail"), renewed an operating agreement for an existing Sears Hometown Store in Corydon, Indiana ("the Corydon Sears Store").  [Filing No. 56-3 at 1.]  Scott is the husband of Defendant Laura Schneider ("Laura"), although Scott and Laura have been separated since October of 2021, and he is the son of Defendant Jerry Schneider ("Jerry").  [Filing No. 56-2 at 1-2; Filing No. 56-7 at 1; Filing No. 59-1 at 32.]  The renewed operating agreement for the Corydon Sears Store ("the Operating Agreement") had a term of July 3, 2016 to July 3, 2021.  [Filing No. 56-3 at 1.]  However, Scott had owned and operated the Corydon Sears Store since approximately 2004.  [Filing No. 59-1 at 9.]  Sears had been licensing a store in Corydon since 1995.  [Filing No. 59-12 at 1.]

Laura began working at the Corydon Sears Store in approximately 2009.  [Filing No. 59-6 at 4.]  She was the general manager of the Corydon Sears Store from approximately 2016 or

---

[2] Scott is not a party to this action, but is the respondent in an arbitration proceeding commenced by Sears in connection with the events underlying this lawsuit.  [See Filing No. 56-6.]  Scott, Laura Schneider, and Jerry Schneider were all deposed during the arbitration proceeding, and their arbitration deposition testimony is presented as evidence in this case, in addition to the deposition testimony they later provided in connection with this case.  [See Filing No. 59-1 through Filing No. 59-6.]

2017 until the store closed.  [Filing No. 59-2 at 5; *see also* Filing No. 59-1 at 23-28 (Scott explaining in a deposition that Laura was "primarily responsible for operating the store").]

Alden Shipley is the owner of the retail space in which the Corydon Sears Store operated ("the Premises").  [Filing No. 56-5 at 1.]  Mr. Shipley leased the Premises to SJS retail, and Sears was not a party to the lease.  [Filing No. 56-5 at 1.]

### C.  Events Surrounding the Closing of the Corydon Sears Store

Eventually, Scott decided to close the Corydon Sears Store and end his business relationship with Sears, although the parties dispute when and why this decision was made.  [*See* Filing No. 61 at 3-5 (highlighting factual disputes).]  The Schneiders point to Scott's deposition testimony in which he states that Sears was not providing sufficient inventory to the Corydon Sears Store and he was not making enough money to keep the store going.  [Filing No. 56-4 at 4-6.]  Sears disputes these statements, pointing out that the commissions paid to SJS in 2016 through 2019 were consistent, despite Scott's testimony that his inventory problems began in 2016 and got progressively worse in the following years.  [*See* Filing No. 59-2 at 14-15 (Scott describing his inventory issues); Filing No. 59-7 (showing the following yearly commissions: $194,028 in 2016; $206,755 in 2017; $204,405 in 2018; and $202,734 in 2019).]

On December 20, 2019, an email was sent from Laura's email account (Laura.Schneider@htstores.com) to Joseph Jurec, a Sears representative, requesting a mutual termination agreement ("MTA") to terminate the Operating Agreement.  [Filing No. 59-8 at 2.] The email stated that it was from Scott.  [Filing No. 59-8 at 2 ("This is Scott from Corydon[.]").] However, Scott testified that Laura, at Scott's direction, typed and sent the email.  [Filing No. 59-

1 at 39.]³  The email alleged that Sears breached the Operating Agreement by failing to provide adequate inventory, reducing commissions, and "holding funds that [were] rightfully earned for extra extended time."  [Filing No. 59-8 at 2.]

On December 30, 2019, Mr. Jurec informed Scott via telephone that his request for an MTA was denied, that Sears expected him to fulfill his contract term under the Operating Agreement, and that, if he abandoned his store, Scott would be liable to Sears for "any profits lost between the time of abandonment and the end of his contract."  [Filing No. 59-8 at 1; *see also* Filing No. 59-1 at 42.]  The following day, Mr. Jurec sent Scott an "abandonment warning notice" via mail to Scott and via email to Laura's email address.  [Filing No. 59-9 at 1; *see also* Filing No. 59-29 (abandonment warning notice sent via mail to SJS Retail, c/o Scott).]

On January 6, 2020, Scott responded to Mr. Jurec's email (through Laura's email account), contesting the idea that he was abandoning the store and reiterating his request for an MTA based on Sears' alleged breaches of the Operating Agreement.  [Filing No. 59-9 at 1.]  He stated that "the last day of business at the Corydon [Sears Store] will be January 31, 2020."  [Filing No. 59-9 at 1.]  The email also stated that "the landlord will not transfer the lease to anyone with intentions of continuing with Sears due to seeing the company continually close stores following the bankruptcy and sell off all the entities, [and] he as well sees no future in the business and does not want to lease to a dying company that can[']t pay its bills.  He already has

---

³ The Court notes that Scott's testimony in his earlier deposition taken in connection with the arbitration proceeding directly contradicts this testimony, as he stated in the earlier deposition that he sent the email without Laura's knowledge or assistance.  [*See* Filing No. 59-2 at 19-20.]  Notably, the Schneiders submitted as evidence Scott's earlier deposition testimony, but not his later, contradictory testimony.  This is a recurring theme throughout this case, as the Schneiders routinely rely on deposition testimony without acknowledging the existence of contradictory testimony from the same individual.  This practice is not helpful, and counsel is cautioned not to allow zealous representation to overshadow his duty of candor to the Court.

the building set to lease with someone else and the store will not be allowed to continue here." [Filing No. 59-9 at 1.]

On January 20, 2020, Mr. Jurec visited the Corydon Sears Store and observed that, "[a]lthough the owner's wife and one other employee [were] in the building," the door was locked, and the store was closed to everyone other than customers picking up previously ordered merchandise. [Filing No. 59-10 at 1-2.] On January 21, 2020, Sears sent a letter to SJS Retail, c/o Scott, stating its belief that SJS Retail, acting through Scott, had unilaterally terminated the Operating Agreement and abandoned the Corydon Sears Store as of January 21, 2020. [Filing No. 59-11 at 1-3.] In relevant part, the letter also stated that SJS Retail and Scott "must immediately discontinue the use of the name 'Sears' and all trade names and trademarks associated with the operation of the [Corydon Sears Store]." [Filing No. 59-11 at 2.] When Mr. Jurec delivered the letter to the Corydon Sears Store, he was asked by police to leave the property and Scott's attorney threatened to have Mr. Jurec arrested for trespassing. [Filing No. 59-12 at 3.]

Generally, when a Sears dealer terminates his or her agreement, but Sears intends to retain the store, Sears exercises its rights under the operating agreement to immediately enter and manage the store until a new dealer can be located and take over. [Filing No. 59-12 at 1.] Upon termination of the Operating Agreement with Scott, Sears contacted Mr. Shipley and requested access to the Premises to secure Sears' merchandise. [Filing No. 59-12 at 3.] Sears also requested a short-term rental rate from Mr. Shipley to secure an occupancy agreement for Sears to operate the Corydon Sears Store on the Premises until a new dealer could be located. [Filing No. 59-12 at 3.] According to Sears, Mr. Shipley was initially open to negotiating a lease with Sears, but he changed his mind on approximately January 23, 2020, when he informed Sears that

he had a new tenant lined up to lease the Premises.  [Filing No. 59-12 at 3.]  Mr. Shipley wanted SJS out of the Premises as soon as possible to accommodate the new tenant, so Sears arranged to have its merchandise removed from the Premises on February 1, 2020.  [Filing No. 59-12 at 3.]

LRI was the new tenant that Mr. Shipley had lined up to lease the Premises.  Jerry stated that, although he could not recall specifically, it is possible that he could have been in communication with Mr. Shipley regarding leasing the Premises prior to January 16, 2020. [Filing No. 59-3 at 29-31; *see also* Filing No. 59-17.]  According to Mr. Shipley, Sears approached him and asked to lease the space, but Mr. Shipley refused "for a variety of reasons, which included [Sears'] mistreatment of SJS, [his] lack of confidence in [Sears'] ability to continue supplying merchandise to store owners, and the corresponding risk that [Sears] would not be able to pay its monthly rent under a new lease."  [Filing No. 56-5 at 2.]  Mr. Shipley asserts that he "made this decision independently" and he "was not influenced by SJS, [LRI], or any member of the Schneider family."  [Filing No. 56-5 at 1-2.]

The parties dispute whether and to what extent Laura and Jerry were involved in or had knowledge of the closing of the Corydon Sears Store or Scott's decision to end his business relationship with Sears.  [*See* Filing No. 61 at 7-9 (highlighting factual disputes).]  Specifically, Sears points to Jerry's testimony that he knew that Scott was having difficulty getting inventory and paying the rent at the Corydon Sears Store.  [Filing No. 59-4 at 10-11.]  Sears also points out that Jerry purchased nearly $20,000 worth of appliances from Walker's Hometown Store on December 3, 2019.  [Filing No. 59-14 at 2.]  In his first deposition, Jerry stated that after purchasing these appliances, he "hauled them to [his] store."  [Filing No. 59-4 at 18-19.]

In addition, Scott testified that he spoke to Laura about potentially terminating his operating agreement before sending the December 20, 2019 email to Mr. Jurec.  [*See* Filing No.

Filing No. 59-1 at 40-41 ("Q. Did you talk to Laura about wanting to get out of your dealer agreement? A. Not like seriously or anything, just, you know, how bad things was looking, and not knowing what to do, maybe would be about it.  Q. And those conversations would have taken place before you sent this e-mail?  A. Yeah.  Q. What was her opinion about getting out of the dealer agreement?  A. Really didn't have one.  She just was like, as long as we have money to pay the bills at home, you know, for the kids.  Whatever we had to do.  If we didn't have money to do that, that we would do something. . . . Q. So when you sent this e-mail, did Laura agree that you need to close the [Corydon Sears Store]?  A. Yeah.").]  Furthermore, the Corydon Sears Store was Scott and Laura's primary source of income in January 2020, [Filing No. 59-6 at 35], and Sears relies on that fact to suggest that Scott would not have closed the store without consulting her.

### D.  The Schneiders' Opening of Schneider's Hometown

In March 2020, a store called Schneider's Hometown was opened on the Premises where the Corydon Sears Store previously operated.  [*See* Filing No. 56-2 at 1.]  Schneider's Hometown sells appliances, furniture, and mattresses.  [Filing No. 56-2 at 1.]  Schneider's Hometown is owned by LRI, which is an entity owned by Jerry and incorporated on January 16, 2020.  [Filing No. 56-2 at 1; Filing No. 59-17 at 2.]  Aside from these matters, the parties dispute many of the facts surrounding the opening and operation of Schneider's Hometown.

According to the Schneiders, LRI was formed and is controlled by Jerry alone.  [*See* Filing No. 55 at 4 (stating that Jerry opened Schneider's Hometown, which is "owned by Lynn Retail, Inc., a company formed by Jerry Schneider").]  Jerry is the sole owner of LRI.  [Filing No. 59-4 at 2.]  However, he testified during one deposition that he could not recall details of forming LRI and could not recall whether anyone helped him form LRI.  [*See* Filing No. 59-4 at

4-6.] Moreover, Jerry testified that the email address appearing on documents concerning LRI (scottjs3120@gmail.com) does not belong to him and he does not use email or computers at all. [Filing No. 59-4 at 4-5; *see also* Filing No. 59-17 at 2.][4] In a later deposition, Jerry testified that Laura helped him establish LRI. [Filing No. 59-3 at 23-25.] Laura, however, denies being involved in forming LRI or assisting Jerry with filling out any related paperwork. [Filing No. 59-5 at 15-17; Filing No. 59-6 at 18.]

The Schneiders also contend that Jerry alone opened Schneider's Hometown. According to Jerry, neither Scott nor Laura had any role in opening Schneider's Hometown, although Jerry later hired Laura to work at the store. [Filing No. 59-4 at 17-18.] Also according to Jerry, he opened Schneider's Hometown because he "sold appliances and furniture from [his] home for many years" and he "decided to open a physical store to increase [his] business opportunities." [Filing No. 56-2 at 1.] Sears disputes Jerry's motivation, pointing to his deposition testimony indicating that although he had previously sold appliances from his home, he had stopped doing that "probably" within the last ten years and did not consider himself to be working in the retail appliance business. [Filing No. 59-3 at 7-8; Filing No. 59-3 at 16.]

---

[4] Although Jerry testified that he did not know about or use this email address, Scott testified that Laura set up the email account for Jerry and it never belonged to Scott. [Filing No. 59-1 at 5.] He stated that "3120" was the store number of the Corydon Sears Store and theorized that Laura used Scott's name, rather than Jerry's, in the address because it "was easier for Laura to remember that when, you know, looking stuff up for [Jerry]." [Filing No. 59-1 at 5.] Laura, however, testified that she did not know who the email address belonged to, though it likely belonged to Scott. [Filing No. 59-5 at 16-17; Filing No. 59-5 at 32-33 ("Q: Whose e-mail was ScottJS3120@gmail as of January 16, 2020? A: I don't know. I mean, obviously it looks like that's Scott's e-mail.").] Notably, Sears appears to have omitted a page of Laura's deposition further discussing this email address. [*See* Filing No. 59-5 at 16 (labeled "Page 21"); Filing No. 59-5 at 17 (labeled "Page 23").] In her earlier deposition, Laura stated that she and Scott set up that email address for Scott to use, though Jerry may have later used it. [Filing No. 59-6 at 10; Filing No. 59-6 at 23.]

Sears also points to evidence that in its view demonstrates that Laura was involved with LRI earlier than she suggests, including while the Corydon Sears Store was still operating.  The email address scottjs3120@gmail.com was used to communicate with Mark Perfitt, a representative of Nationwide Marketing Group ("Nationwide"), as early as January 7, 2020, regarding marketing services for Schneider's Hometown.  [Filing No. 59-16.]  Mr. Perfitt set up a meeting at a McDonald's restaurant in Corydon on January 14, 2020.  [Filing No. 59-16 at 1.]  In an email sent to Laura on February 28, 2020, Mr. Perfitt confirmed another meeting between himself, Laura, Scott, and Jerry.  [Filing No. 59-18 at 1.]  On August 20, 2020, Laura sent an email to Mr. Perfitt indicating that she would discuss certain information concerning which services to purchase with "Jerry and Scott."  [Filing No. 59-19.]  Scott denied ever meeting with Mr. Perfitt or anyone from Nationwide.  [Filing No. 59-1 at 55.]  Jerry testified that he does not know anything about Nationwide.  [Filing No. 59-4 at 15-16.]  However, on January 21, 2020, Jerry purportedly signed a contract with Nationwide on behalf of LRI, which allowed Schneider's Hometown to become a member of Nationwide Marketing Group, although he could not say who negotiated that contract on behalf of LRI and he stated that his deposition was the first time he had ever seen the document.  [Filing No. 59-3 at 44-45.]

On January 16, 2020, Mr. Perfitt sent an email to Steve Mahler, another Nationwide employee, which read as follows:

> Good Afternoon Steve
> I have a prospect (brand new business) - Schneider Appliance (may be different name when they officially launch) that is evaluating NMG membership.
> FYI - their past experience in the appliance industry is associated with the Sears Home Store program.
> They would like to talk with you regarding POS systems available that would fit / support a new appliance business.
> They will also be attending PT Houston as our Guest.

> The contact would be Laura Schneider and her cell is 812-267-0965 and she
> can be reached via e-mail at scottjs3120@gmail.com
> Thanks
> Mark

[Filing No. 59-36 at 1.]   An email dated January 30, 2020 shows that Laura and Scott were registered to attend a trade show in Houston on behalf of a company called "Schneider Appliance." [Filing No. 59-15.]

### E.  Operation of the Schneider's Hometown Store

Laura worked at Schneider's Hometown until May of 2021 ordering merchandise, selling merchandise to customers, and managing the day-to-day operations of the store.  [Filing No. 59-6 at 51-52.]  She ultimately left that job to spend more time with her kids and to find a job that would provide her with health insurance.  [Filing No. 59-6 at 52.]  When Laura left, Jerry hired Tyler Schneider, who is Scott's son,[5] to run Schneider's Hometown.  [Filing No. 59-1 at 6; Filing No. 59-6 at 52.]  It is not clear whether Jerry is capable of running the store himself.  [*See* Filing No. 59-6 at 52 (Laura's deposition testimony, stating: "Q. Would Jerry be able to run the day-to-day operations of Schneider's Hometown by himself?  A. He could fumble his way through it, I'm sure. Yes. Technology isn't always a friend, but he could probably figure it out, possibly.").]

Schneider's Hometown maintains a Facebook page and a website, [*see* Filing No. 59-24; Filing No. 59-48], but Jerry does not own a computer and does not use social media or email, [Filing No. 59-3 at 19-20].  Laura helped Jerry design the website for Schneider's Hometown. [Filing No. 59-4 at 21.]  The website states: "We have been in the Appliances, Furniture, and Mattresses business for years. . . .  We have long standing relationships with the biggest manufacturers and know all of our products inside and out."  [Filing No. 59-48 at 1.]

---

[5] It is not clear from the record if Tyler is also Laura's son.

12

Schneider's Hometown uses the phone number 812-738-6164 ("the Phone Number"). [*See, e.g.*, Filing No. 59-23 at 1; Filing No. 59-24 at 1.] The Phone Number is the same phone number that was used by the Corydon Sears Store. [*See* Filing No. 59-10 (directing customers to call that number if they had merchandise to pick up).]

The products sold at Schneider's Hometown are similar to the products previously sold at the Corydon Sears Store, which included major home appliances and lawn and garden equipment. [Filing No. 59-12 at 4.] Schneider's Hometown is now using fixtures previously owned by Sears and built to Sears' specifications to display merchandise. [Filing No. 59-12 at 4.] Various posts on the Schneider's Hometown Facebook page include photos taken inside Schneider's Hometown, depicting vignettes, fixtures, posters, and signage that was owned by Sears and not returned after the closing of the Corydon Sears Store. [Filing No. 59-12 at 3-7; *see also* Filing No. 59-24.] A Sears representative opined that "[t]here is no discernible difference in the look and feel of Schneider's Hometown now compared to when SJS and Scott were operating [the Premises] as [the Corydon Sears Store]." [Filing No. 59-12 at 6.] Specifically, the flooring, paint colors, fixtures, signage, and arrangement of merchandise are all the same in Schneider's Hometown as they were in the Corydon Sears Store. [Filing No. 59-12 at 3-7.]

Sears submitted as evidence screenshots from Schneider's Hometown's website and Facebook page, as well as from Sears' website. [Filing No. 59-22; Filing No. 59-23; Filing No. 59-24; Filing No. 59-48.] The Facebook page contains various posts with photographs taken inside the Schneider's Hometown store. [Filing No. 59-24.] In addition, among other things, the Sears and Schneider's Hometown websites and the Schneider's Hometown Facebook page feature the images depicted below:






### F.  This Lawsuit

On June 4, 2021, Sears initiated this lawsuit against the Schneiders, alleging claims for: (1) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (2) tortious interference with a contract under Indiana law; and (3) tortious interference with prospective economic advantage under Indiana law.  [Filing No. 1.]  The Schneiders seek judgment in their favor on all of Sears' claims.  [Filing No. 54.]

**III.**
**DISCUSSION**

### A.  Unfair Competition Under the Lanham Act

In support of their Motion for Summary Judgment, the Schneiders argue that Sears cannot prove its claim for unfair competition because it cannot demonstrate either: (1) that it has a valid, protectable trademark interest in the word "hometown," the Phone Number, or the red, white, and blue trade dress; or (2) a likelihood of confusion among consumers.  [Filing No. 55 at 6-14.]  Specifically, the Schneiders assert that because this case does not involve alleged infringement of one of Sears' registered trademarks, Sears has the burden of proving that its unregistered marks—the word "hometown," the Phone Number, and the color scheme—are

entitled to protection under the Lanham Act. [Filing No. 55 at 8.] According to the Schneiders, none of these things are entitled to trademark protection because "hometown" is a generic or descriptive term, there is no risk that a consumer will see the generic Phone Number and associate it with Sears, and the identifying mark used by Sears is its "Sears Hometown" logo, not its red, white, and blue color scheme. [Filing No. 55 at 8-10.] In addition, the Schneiders contend that there is no evidence that any of the unregistered marks at issue have acquired secondary meaning. [Filing No. 55 at 10-11.] The Schneiders further argue that, even if there are genuine issues of material fact as to whether the unregistered marks are protectable, the Schneiders would still be entitled to summary judgment because Sears cannot demonstrate a likelihood of confusion. [Filing No. 55 at 11-13.] The Schneiders also assert that, in any event, "all forms of monetary relief are foreclosed to Sears because it cannot show both actual damages and actual confusion. [Filing No. 55 at 13-14.]

Sears responds that the Schneiders' Motion for Summary Judgment "is based on the incorrect impression that [Sears] is asserting a claim for trademark infringement," when in reality Sears' "claim for unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is based on [the Schneiders'] use of a confusingly similar name, sign, trade dress, and the same phone number as the former Sears Hometown store at the Corydon [Sears Store]." [Filing No. 60 at 12.] Sears argues that because the Schneiders have misunderstood Sears' claim, "the motion lacks an argument as to the elements of the unfair competition claim," and the Schneiders "have therefore failed to establish that they are entitled to judgment as a matter of law." [Filing No. 60 at 13.] In Sears' view, "[a]t best, [the Schneiders] have conceivably addressed only the likelihood of confusion requirement" of the unfair competition claim. [Filing No. 60 at 13.] With respect to that requirement, Sears contends that it is not required to demonstrate actual

confusion—only a likelihood of confusion—and a reasonable trier of fact could find that the Schneiders' use of a similar name, sign, and trade dress to sell appliances could create a likelihood of confusion regarding the Schneiders' affiliation with Sears.  [Filing No. 60 at 13-14.] Sears argues that the Schneiders are incorrect in their assertion that the lack of actual confusion forecloses all monetary relief, as the caselaw establishes that other relief, including disgorgement of the Schneiders' profits and possibly attorneys' fees, is available even in the absence of actual confusion.  [Filing No. 50 at 14-15.]

In reply, the Schneiders argue that claims for trademark infringement and unfair competition under the Lanham Act are "inextricably intertwined" and both require a plaintiff to show: (1) that its mark is protectable; and (2) that the defendant's use of the mark is likely to cause confusion among consumers.  [Filing No. 62 at 2.]  Accordingly, the Schneiders contend, in order for Sears to succeed on its Lanham Act claim, it must "demonstrate with specific evidence that it has a protectable interest in the word 'hometown,' the colors red, white, and blue, and the phone number," and because it failed to do so and "put forth no argument on how its marks are protectable," summary judgment is appropriate.  [Filing No. 62 at 2.]  The Schneiders argue that actual confusion is a "particularly important" factor in evaluating whether a likelihood of confusion exists.  [Filing No. 62 at 7-8.]

At the outset, the parties appear to disagree about the nature of the Lanham Act claim at issue in this lawsuit.  Sears repeatedly asserts that its claim is one for "unfair competition," under Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A).  [See Filing No. 60 at 12.]  And although Sears criticizes the Schneiders' Motion for Summary Judgment as "lack[ing] an argument as to the elements of the unfair competition claim," [Filing No. 60 at 13], the Court notes that Sears similarly does not set out what it believes to be the elements of an unfair competition claim

16

anywhere in its brief, apart from quoting the relevant statute.  The Schneiders, on the other hand, appear to treat the claim as one for unfair competition based on trademark infringement.  [*See* Filing No. 62 at 2 (arguing that "claims brought under the Lanham Act for trademark infringement and unfair competition are inextricably intertwined").]

Although the Lanham Act prohibits trademark infringement, it also "goes beyond trademark protection" and "creates a cause of action for unfair competition through misleading advertising or labeling." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (internal quotations and citation omitted).  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "is one of the few provisions that goes beyond trademark protection." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003).  The Supreme Court has clarified that, due to the "inherently limited wording" of this provision, it "does not have boundless application as a remedy for unfair trade practices" and "can never be a federal 'codification' of the overall law of 'unfair competition.'" *Id.* (internal quotations and citations omitted).  Instead, it "can apply only to certain unfair trade practices prohibited by its text." *Id.*

Relevant to this case, Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), imposes civil liability on "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  The Supreme Court has called this cause of action "false association." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

17

Notably, the term "false association" does not appear in the Complaint or any of the summary judgment briefing, [Filing No. 1; Filing No. 55; Filing No. 60; Filing No. 62], nor does it appear to be a term that is widely used in caselaw in this Circuit.[6]  Nevertheless, "false association" is an appropriate name for Sears' Lanham Act claim in this case, because the gist of Sears' claim is that the Schneiders created a false impression that their business and its products were associated with Sears.

Regardless of what the claim is called, the Seventh Circuit has repeatedly indicated that a protectable trademark interest is an element of a claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  *See Phoenix Ent. Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016) ("To prevail on either [a claim under Section 32 or Section 43(a)(1)(A) of the Lanham Act], a plaintiff must be able to show (1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers.") (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001)); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) ("In order to prevail in an action under § 43(a) of the Lanham Act, [15 U.S.C. § 1125(a), the plaintiff] must establish: '(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product.'") (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988), *abrogation on other grounds recognized by Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)).  This is consistent with how other courts have defined false association claims.  *See Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 230 (3d Cir. 2017) ("The elements of

---

[6] That is not to say the Seventh Circuit Court of Appeals or District Courts within this Circuit have never used the term.  *See Martin v. Living Essentials, LLC*, 653 F. App'x 482, 484 (7th Cir. 2016) (discussing a claim under § 1125(a)(1)(A) for "false association or endorsement"); *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 931 (N.D. Ill. 2016) (noting that "there are two bases for liability [under 15 U.S.C. § 1125(a)(1)]: false association or endorsement, under subsection (A); and false representations in advertising, under subsection (B)").

a false association trademark claim under the Lanham Act track the elements of a common law trademark infringement claim: a plaintiff must prove that '(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.'") (citation omitted); *EST Inc. v. Royal-Grow Prods., LLC*, 526 F. Supp. 3d 943, 953 (D. Kan. 2021) ("The false association elements under Section 43 are like those of a Section 32 infringement claim."); *Greenwich Taxi, Inc. v. Uber Techs., Inc*., 123 F. Supp. 3d 327, 339 (D. Conn. 2015) ("For false association, in addition to showing that the defendant's use of the plaintiffs' trademarks is likely to cause confusion, a plaintiff also has to establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services without the plaintiff's consent.") (internal quotations, alterations, and citation omitted). *But see Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) ("Significantly, the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action.").

Sears' response brief seems to suggest that a protectable trademark interest is not an element of its unfair competition claim.  [*See* Filing No. 60 at 12-13.]  In support of this suggestion, Sears points to the Court's previous decision in *Brownstone Publishing, LLC v. AT & T, Inc*., in which the Court explained the difference between a trademark claim and an unfair competition claim as follows:

> In simplified terms, [15 U.S.C.] § 1114 provides a cause of action against any person who either (1) uses a trademark in connection with the sale, distribution, or advertising of any goods or services where that use is "likely to cause confusion, or to cause mistake, or to deceive," § 1114(1)(a); or (2) reproduces and applies a trademark to labels, prints, or advertisements intended to be used in commerce in connection with the sale, distribution, or advertising of goods or services where

such use is "likely to cause confusion, or to cause mistake, or to deceive," § 1114(1)(b). In contrast, a § 1125(a)(1)(A) claim is against a person who, in connection with any goods or services, uses a word, term, name, symbol, device, or false designation or description of fact "which is likely to cause confusion, or to cause mistake, or to deceive as to [1] the affiliation, connection, or association of such person with another person, or [2] as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person."

Brownstone Publ'g, LLC v. AT & T, Inc., 2009 WL 799546, at *5 (S.D. Ind. Mar. 24, 2009) (emphasis omitted).  This explanation, while correctly characterizing the differences between claims under § 1114 and § 1125, does not address a significant commonality between those claims, which, as the Seventh Circuit has repeatedly noted, is that they both require demonstration of a protectable trademark interest.  See Phoenix Ent. Partners, 829 F.3d at 822; Ty, Inc., 237 F.3d at 897; CAE, Inc., 267 F.3d at 673-74.  The existence of a protectable trademark interest was not at issue in Brownstone Publishing.  See 2009 WL 799546, at *1-7.

Sears also points to the text of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which on its face says nothing about a protectable trademark interest.  But even in the absence of binding Seventh Circuit precedent instructing that a protectable trademark interest is essential to a claim under this provision, logic dictates that such an interest would be required.  Sears explains that its unfair competition claim, in accordance with the text of § 1125(a)(1)(A), "is based on [the Schneiders'] use of a confusingly similar name, sign, trade dress, and the same phone number as the former Sears Hometown store at the Corydon [Sears Store]." [Filing No. 60 at 12.] But that begs the question: "confusingly similar" to what?  The answer can only be to a name, sign, trade dress, or phone number in which Sears has a trademark interest protected by the Lanham Act.  See CAE, Inc., 267 F.3d at 672 ("Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce.").  Put differently, for Sears to succeed on its claim that the Schneiders

caused consumers to be confused by their use of a certain name, sign, trade dress, or phone number, there must be something about the name, sign, trade dress, or phone number that consumers associate with Sears.  In trademark law, that something is called distinctiveness, which is the basis of trademark protection.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Samara Bros*., 529 U.S. 205, 210 (2000)* ("Distinctiveness is[] . . . an explicit prerequisite for registration of trade dress [or trademark] under § 2 [of the Lanham Act], and 'the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).'") (citation omitted).

"Trademark law awards trademark protection to various categories of words, terms, and phrases if consumers rely on those marks to identify and distinguish one company's goods or services from those of others." *SportFuel, Inc. v. PepsiCo, Inc*., 932 F.3d 589, 598 (7th Cir. 2019).  "Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Id.* (internal quotations and citation omitted).  Generally, suggestive, arbitrary, and fanciful terms are afforded automatic protection, descriptive terms are entitled to protection only if they have developed secondary meaning, and generic terms are not entitled to protection.  *Id.*; *see also Uncommon, LLC v. Spigen, Inc*., 926 F.3d 409, 420 (7th Cir. 2019) (explaining that fanciful, arbitrary, and suggestive marks are inherently distinctive, while descriptive marks become distinctive only if they have acquired secondary meaning).  The same analysis applies not only to word and symbol marks, but also to trade dress, which includes the packaging, dressing, and design of a product. *See Wal-Mart Stores, Inc*., 529 U.S. at 209-11.

Returning to the elements of Sears' unfair competition claim based on false association—a protectable trademark interest and a likelihood of confusion—issues of material fact remain

that preclude the entry of summary judgment in the Schneiders' favor.  As an initial matter, Sears has not helpfully defined the trademark interests it seeks to protect, or responded to the Schneiders' arguments that, based on a lack of distinctiveness, Sears does not have a protectable trademark interest in the word "hometown," the Phone Number, or its trade dress, including its red, white, and blue color scheme.  Nevertheless, issues of material fact remain concerning whether Sears has a protectable trademark interest relevant to this lawsuit.  It is undisputed that Sears owns two valid trademarks—"Sears Hometown Store" and "Sears Authorized Hometown Store."  Whether Sears has a protectable interest in the word "hometown," the Phone Number, its signage, its trade dress, or anything else is a question of fact.  Inherent distinctiveness, descriptiveness, and secondary meaning are all questions of fact, and therefore summary judgment on these issues is appropriate if no reasonable factfinder could find in the nonmovant's favor.  *See Uncommon LLC*, 926 F.3d at 420, 424.  The Court cannot conclude at this juncture that no reasonable factfinder could find in Sears' favor.

"[Likelihood of confusion], too, is a question of fact, appropriate for summary-judgment resolution only if no reasonable factfinder could decide for [the non-movant]."  *Uncommon, LLC*, 926 F.3d at 425.  There is enough evidence in the record concerning the alleged similarities between the Corydon Sears Store and the Schneider's Hometown store, as well as each store's marketing materials, such that a reasonable factfinder could find in Sears' favor on this issue and conclude that consumers are likely to be confused about whether Schneider's Hometown is associated with Sears.

Based on the foregoing, the Schneiders' Motion for Summary Judgment, [Filing No. 54], is **DENIED** with respect to Sears' Lanham Act claim for unfair competition based on false association.  However, given the lack of clarity concerning Sears' Lanham Act claim, Sears is

22

**ORDERED** to file a Statement of Claims within **7 days** of this Order, specifically stating its theory of liability relevant to that claim, including defining the trademark interest it seeks to protect.  The Schneiders must file a Statement of Defenses within **7 days** of the filing of the Statement of Claims.   To the extent these deadlines conflict with the Amended Case Management Plan, [Filing No. 49], this Order shall control.

### B.  Tortious Interference With a Contract Under Indiana Law

The Schneiders argue that Sears' claim for tortious interference with a contract is foreclosed because: (1) there is no evidence that the Schneiders intentionally induced Scott to terminate the Operating Agreement; and (2) the Schneiders opened Schneider's Hometown for legitimate business reasons.   [Filing No. 55 at 15.]   In the Schneiders' view, Scott "has unequivocally testified that he terminated the [Operating] Agreement, not because of any inducement on the part of [the Schneiders], but because Sears was not providing him adequate inventory" and he "feared losing both the store and his home."  [Filing No. 55 at 15.]  The Schneiders further argue that the evidence shows that Jerry had been selling appliances from his home for many years and opened Schneider's Hometown to "expand his business opportunities." [Filing No. 55 at 15.]  They contend that, "absent some evidence of intentional inducement or some evidence of malicious intent exclusively directed to the injury and damage of Sears," they are entitled to summary judgment on the claim for tortious interference with a contract.  [Filing No. 55 at 15.]

In response, Sears argues that summary judgment is inappropriate because there are factual disputes concerning whether Laura and Jerry knew of the existence of the Operating Agreement, whether they induced Scott and SJS Retail to breach the agreement, and whether any

interference was justified.  [Filing No. 60 at 15-19.]  Sears points to specific evidence in the record, which it contends creates issues of material fact.  [Filing No. 60 at 15-19.]

In reply, the Schneiders reiterate their arguments and assert that Sears has provided no evidence contradicting Scott's, Laura's, or Jerry's testimony indicating that Scott had resolved to terminate the Operating Agreement before discussing the matter with Laura or Jerry.  [Filing No. 62 at 6-7.]

Under Indiana law, "[o]ne who induces a party to a contract to break it, intending to injure another person or to get a benefit for himself, commits an actionable wrong unless there is sufficient justification for the interference."  *Bragg v. City of Muncie*, 930 N.E.2d 1144, 1147 (Ind. Ct. App. 2010) (citing *Wade v. Culp*, 23 N.E.2d 615, 618 (Ind. Ct. App. 1939)).  The elements of a claim for tortious interference with a contract are: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of a contract; (3) the defendant's intentional inducement of the breach of contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach.  *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019).

Regarding the absence of justification element, Indiana courts have applied two different tests.  *See Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 215 (Ind. 2019) (acknowledging the two approaches but concluding that issues of material fact precluded summary judgment under either approach); *see also Denman v. St. Vincent Med. Grp., Inc.*, 176 N.E.3d 480, 497 (Ind. Ct. App. 2021), *transfer denied*, 180 N.E.3d 942 (Ind. 2022) ("[N]ot all Indiana courts have found that proof of malicious conduct is required to show an absence of justification.").  Under one approach, courts require the plaintiff to show that the defendant "act[ed] intentionally and without a legitimate business purpose and that 'the breach is malicious

and exclusively directed to the injury and damage of another.'" *Am. Consulting, Inc.*, 136 N.E.3d at 215 (quoting *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000)).   Under the other approach, courts consider whether the defendant's conduct was "fair and reasonable," considering the factors outlined in the Restatement (Second) of Torts.  *See Am. Consulting, Inc.*, 136 N.E.3d at 215 (citing *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 49-52 (Ind. Ct. App. 2004), *vacated on other grounds by Coca-Cola v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 560 (Ind. 2006)).   The Indiana Supreme Court has expressly considered the Restatement factors—which include the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant's conduct interferes, the interests sought to be advanced by the defendant, the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff, the proximity or remoteness of the defendant's conduct to the interference, and the relations between the parties—in determining whether a defendant's conduct was justified, noting that "the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994).

Here, the Schneiders assert that Sears cannot establish the third and fourth elements of its claim for intentional interference with a contract: that the Schneiders intentionally induced Scott to breach the Operating Agreement, and the absence of a justification for the Schneiders' conduct.   But in making their arguments, the Schneiders grossly mischaracterize the record. First, although the Schneiders contend that Scott's testimony "unequivocally" establishes that he terminated the Operating Agreement due to a lack of adequate inventory and that he decided to terminate the agreement before disclosing his intention to Laura or Jerry, the evidence is not so one-sided.  Taken together, there is evidence in the record from which a reasonable factfinder

could choose to disbelieve Scott's, Laura's, and Jerry's testimony and conclude that Scott

(individually and through SJS) worked directly with the Schneiders to close the Corydon Sears

Store and open Schneider's Hometown, in violation of the Operating Agreement.  This evidence

includes the following:

- Laura and Scott were married, and Jerry is Scott's father;

- The Corydon Sears Store was a primary source of their family income;

- Laura worked as the manager of the Corydon Sears Store at the same time she was allegedly helping Jerry to establish LRI, and after Schneider's Hometown opened, she was the manager of that store;

- The emails requesting a termination of the Operating Agreement were sent from Laura's email account, and were potentially typed and sent by her;

- Scott testified that he discussed closing the Corydon Sears Store with Laura;

- Although Scott points to inadequate inventory and profits as his reason for breaching the Operating Agreement, the commissions paid to SJS by Sears were consistent from 2016 to 2019, in the following amounts: $194,028 in 2016, [Filing No. 59-7 at 12]; $206,755 in 2017, [Filing No. 59-7 at 24]; $204,405 in 2018, [Filing No. 59-7 at 36]; and $202,734 in 2019, [Filing No. 59-7 at 48]; and

- Jerry purchased a large quantity of appliances in December 2019, before Scott abandoned and closed the Corydon Sears Store.

In addition, although the Schneiders assert that Jerry opened Schneider's Hometown to

expand his business opportunities, there is evidence from which a reasonable factfinder could

conclude otherwise.   Specifically, Jerry indicated that he quit the appliance business

approximately ten years ago, and he does not appear to be involved in the daily operations of

Schneider's Hometown, which was managed by Laura and then by Scott's son, Tyler.  Jerry's

testimony also indicates that he may not have been involved in establishing LRI in the first place,

as he could not remember any details about filing the required paperwork or engaging with

Nationwide.

In sum, whether and to what extent the Schneiders were involved in or responsible for Scott's breach of the Operating Agreement is a question for the factfinder to decide. Factual disputes remain concerning who knew what and when, who took certain actions, and what each party's intentions and motivations were. Accordingly, the Schneiders' Motion for Summary Judgment, [Filing No. 54], is **DENIED** as to Sears' claim for tortious interference with a contract.

### C.  Tortious Interference With Prospective Economic Advantage

The Schneiders argue that Sears' claim for tortious interference with prospective economic advantage fails because: (1) the evidence establishes that Sears did not have a business relationship with Mr. Shipley; (2) the Schneiders "had never seen or read the [Operating] Agreement and thus had no knowledge of its terms"; (3) there is no evidence showing that the Schneiders intentionally interfered with any relationship between Sears and Mr. Shipley; and (4) Sears has not alleged and cannot show that the Schneiders acted illegally. [Filing No. 55 at 16.] The Schneiders point to Mr. Shipley's declaration, which they contend "makes clear that his decision not to rent the premises to Sears was based upon multiple factors—none of which had anything to do with [the Schneiders]." [Filing No. 55 at 16.]

In response, Sears argues that the same factual disputes precluding summary judgment on its claim for tortious interference with a contract preclude summary judgment on its claim for tortious interference with prospective economic advantage. [Filing No. 60 at 19.] Additionally, Sears contends that the Schneiders' violation of the Lanham Act is sufficient "illegal conduct" to support the claim for tortious interference with prospective economic advantage. [Filing No. 16 at 19-20.] Sears also argues that whether it had a business relationship with Mr. Shipley is immaterial, because it had an expectation of taking over operations of the Corydon Sears Store

upon termination of the Operating Agreement, and it was the Schneiders' interference that prevented Sears from doing so.  [Filing No. 60 at 20.]

In reply, the Schneiders reiterate their arguments and assert that Sears failed to establish a violation of the Lanham Act and failed to present evidence contradicting Mr. Shipley's testimony that his decision not to rent the premises to Sears was not influenced by the Schneiders.  [Filing No. 62 at 7.]

The elements of a claim for tortious interference with a prospective economic advantage—more appropriately called tortious interference with a business relationship[7]—under Indiana law are: (1) the existence of a business relationship; (2) the defendant's knowledge of the existence of that relationship; (3) the defendant's intentional interference in that relationship; (4) the absence of any justification; and (5) damages resulting from the defendant's wrongful interference with the relationship.  *Miller v. Cent. Indiana Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (quoting *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000)); *see also Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003).  In addition, "[i]llegal conduct by the alleged wrongdoer is an essential element of tortious interference with a business relationship." *Miller*, 11 N.E.3d at 961.

Sears' contentions that whether a business relationship with Mr. Shipley existed is "immaterial" and that "the 'prospective economic advantage' that [the Schneiders] interfered with

---

[7] While Indiana caselaw addressing "tortious interference with a business relationship" abounds, there are few cases discussing, or even mentioning, "tortious interference with a prospective economic advantage."  However, the Seventh Circuit has applied the label "tortious interference with a prospective economic advantage" to a claim with the same elements that Indiana uses to define the claim it calls "tortious interference with a business relationship."  *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003).  Sears' briefing also cites caselaw discussing tortious interference with a business relationship.  [*See* Filing No. 60 at 19 (citing *Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137, 1139 (Ind. Ct. App. 1992)).]  The Court therefore assumes that Sears' claim is one for tortious interference with a business relationship.

was not just [Sears'] ability to operate a transition store [on the Premises], but its ability to locate a new dealer to take over operations full time," [Filing No. 60 at 20], miss the mark. The existence of a business relationship with a third party is an essential element of Sears' claim. To the extent that Sears points to alleged interference with its ability to find a new dealer to operate the Corydon Sears Store, it has not identified any potential new dealers, and therefore has not presented evidence from which a reasonable factfinder could conclude that the Schneiders interfered with Sears' relationship with any specific third party. Mr. Shipley, on the other hand, presents a different situation. Although it is undisputed that Sears never signed a lease or had a contractual relationship with Mr. Shipley, the tort of interference with a business relationship is intended to provide an avenue for relief where the parties' relationship has not been memorialized in a contract. *See, e.g.*, *Levee*, 729 N.E.2d at 220 ("We have consistently held that an action for intentional interference with a business relationship arises where there is no contract underlying the relationship involved in the litigation."). And there is evidence—in the form of a declaration by a Sears representative—that Sears was in negotiations with Mr. Shipley for a short-term lease of the Premises. Accordingly, there is, at minimum, a factual dispute as to whether Sears and Mr. Shipley had a business relationship. Further, Mr. Shipley asserted that he did not wish to lease the Premises to Sears in part because of Sears' supposed treatment of Scott, and Jerry testified that he could have been in contact with Mr. Shipley before January 16, 2020. This is evidence from which a reasonable factfinder could potentially conclude that the Schneiders intentionally interfered with the relationship between Sears and Mr. Shipley.

As to the lack of justification element, it is analyzed in the same way that it is analyzed with respect to claims for tortious interference with a contract. *See* *Miller*, 11 N.E.3d at 961 (considering the Restatement factors to determine whether "the interferer acted intentionally,

without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another").  Questions of fact remain as to the Schneiders' motivation for leasing the Premises.

Finally, to the extent that the Schneiders violated the Lanham Act, such violation could serve as the predicate illegal conduct for a claim of tortious interference with a business relationship.  *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999) (concluding that predicate illegal acts need not be criminal, and claim for trademark dilution could serve as the required predicate illegal conduct).  Because the Schneiders' potential Lanham Act liability is undetermined, a factual issue remains as to whether this element of the tortious interference with a business relationship claim has been satisfied.

For these reasons, the Schneiders' Motion for Summary Judgment, [Filing No. 54], is **DENIED** as to Sears' claim for tortious interference with a business relationship (otherwise stated as tortious interference with a prospective economic advantage).

## IV.
### CONCLUSION

Based on the foregoing, the Schneiders' Motion for Summary Judgment, [54], is **DENIED**.  Sears is **ORDERED** to file a Statement of Claims within **7 days** of this Order, specifically stating its theory of liability on all of its claims, including defining the trademark interest it seeks to protect with respect to its Lanham Act claim.  The Schneiders must file a Statement of Defenses within **7 days** of the filing of the Statement of Claims.  To the extent these deadlines conflict with the Amended Case Management Plan, [Filing No. 49], this Order shall control.  The Court requests that the Magistrate Judge confer with the parties in an attempt to reach a resolution of this case short of trial.  Trial remains set for March 13, 2023.

Date: 1/19/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**

**Magistrate Judge  Barr**